UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT



| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : Civil No. 3:02CV00396 (AVC) |
| VS. | : |
| AMERICAN HOME CARE, INC., et al., | : |
| Defendant. | : October 10, 2003 |

GOVERNMENT'S PROPOSED FINDINGS OF FACTS
AND CONCLUSIONS OF LAW

The Government hereby submits its proposed Findings of Facts and Conclusions of Law in preparation for trial.

**Proposed Findings of Facts**

I.     **The Formation and Operation of AHC**

On September 1, 1992, defendant Judith Bachand incorporated AHC under Connecticut law, for the purpose of operating an HHA. AHC began to participate in the Medicare program as a provider of home health services on January 29, 1993. For Medicare cost-reporting purposes, AHC operated on a calendar year basis. Associated Hospital Service of Maine, Inc. ("the Intermediary") served as AHC's Medicare intermediary. AHC provided services to Medicare beneficiaries out of a main office and various branch offices in Fairfield County, Connecticut.

At all times relevant to this case, Judith Bachand was the sole director and shareholder of AHC, as well as the corporation's President and Administrator. Gregory Bachand, Judith's husband, was the corporation's Chief Counsel and Chief Operating Officer. Their three children,

Derek, Chad, and Tanya Bachand, served in various administrative and corporate capacities. Judith and Gregory's daughter-in-law, Yvonne Bachand, was AHC's Home Health Aide Director.

Judith Bachand capitalized AHC with only $1,000 in common stock, the minimum amount authorized. At all times relevant to this case, AHC was insolvent - that is, its liabilities exceeded its assets. By the end of 1993, AHC's first year of operation, the corporation's liabilities exceeded its assets by $82,226. This deficit grew to $810,867 by the end of 1994, and to $1,505,756 by the end of 1995. On June 30, 1996, AHC's liabilities exceeded its assets by $1,296,288.

During 1993 and 1994, AHC paid Judith and Gregory Bachand a total of $528,044 in salaries and other compensation. Of this amount, $141,267 was excessive, and out of line with the compensation paid for similar positions by other Medicare-certified HHAs in Connecticut.

During 1994, AHC paid Derek (aged 23), Chad (aged 22), and Tanya (aged 20) a total of $167,993 in compensation. For the first five months of 1994, Chad was a full-time student at Xavier University in Cincinnati, Ohio. For all of 1994, Tanya was a full-time student at Fairfield University. Of the $167,993 paid to Derek, Chad, and Tanya in 1994, $100,294 was excessive, and out of line with the compensation paid for similar positions by other Medicare-certified HHAs in Connecticut.

During 1995 and 1996, AHC paid Yvonne Bachand a total of $14,928 in excessive compensation.

AHC had two pension plans: a defined contribution or profit sharing plan (referred to as the "Retirement Plan"), and a defined benefit plan (referred to as the "Pension Plan"). While the

Retirement Plan was available to all employees, the Pension Plan was available only to salaried employees (i.e., the plan excluded "per diem" nurses or therapists). Each plan had a five year vesting requirement. Under each plan, employer contributions were allocated to individual employee accounts on the basis of salaries.

In 1994, AHC contributed a total of $409,083 to these two plans. Of this amount, $314,263 was excessive, and out of line with the pension costs incurred by the 22 other Medicare-certified HHAs in Fairfield County.

On December 29, 1995, AHC's Board of Directors decided that no employer contribution would be made to the Retirement Plan for 1995. Despite this decision, AHC claimed Medicare reimbursement in its 1995 cost report for an accrued contribution to its Retirement Plan of $544,020. AHC also claimed Medicare reimbursement for an accrued contribution to its Pension Plan of $144,255. However, AHC never liquidated (i.e., paid) either accrual.

AHC made the following payments for goods and services that were unrelated to patient care and that personally benefitted the Bachands: $3,224 for travel and entertainment costs; $19,618 in automobile leasing costs; and $14,821 for dinner and "meeting and meals" expenses. AHC also paid $8,632 in college and graduate school tuition expenses incurred by Judith and Chad Bachand.

## II. The Formation and Operation of ASMG

At some point in 1994, Judith and Gregory Bachand formed a separate corporation: American Senior Management Group, Inc. ("ASMG"). Judith, Derek, Chad, and Tanya Bachand each held a 25% ownership interest in ASMG. Judith and Gregory were directors of ASMG, and Gregory was the corporation's President and Secretary.

3

Although AHC and ASMG were separately incorporated, the two corporations were physically and operationally indistinct. ASMG was "comprised of current senior management" of AHC - specifically, Judith and Gregory and their three children. Moreover, the two corporations were located in the same building, and shared personnel and services, including accounting services.

On December 30, 1994, the Board of Directors of AHC (consisting solely of Judith Bachand) decided to contract with ASMG, effective January 1, 1995, to obtain the latter corporation's "management expertise". In the written contract between the two corporations (which Gregory Bachand signed for both parties), ASMG agreed that its "Management Team" would perform "all management duties" for AHC. The contract did not establish a specific fee for these management services. Rather, in the contract, AHC agreed to pay ASMG an "annual fee", consisting of "the sum total of all billings rendered by [ASMG] including expenses and miscellaneous charges as may be accounted for from time to time".

On March 12, 1994, AHC's Board of Directors decided to purchase property in Stratford, Connecticut, to be used as a potential site for a branch office. However, due to zoning problems, AHC decided not to go ahead with the purchase and, on December 22, 1995, the Board decided to transfer the "deposit made relative thereto" to ASMG.

During 1995, AHC paid a total of $716,140 in "management fees" to ASMG. The services provided by ASMG to AHC during 1995 consisted of management services rendered by Judith and Gregory Bachand and their three children (technically, the five Bachands were employed by ASMG, not by AHC, during 1995). ASMG paid the five Bachands a total of $375,417 in salaries for these services.

4

During 1995, the five Bachands utilized $10,064 in personal automobile expense paid by AHC. Thus, the compensation paid to the five Bachands in 1995 totaled $385,481 ($375,417 in salaries paid by ASMG, and $10,064 in personal automobile expense paid by AHC).

Of the $385,481 paid to the five Bachands in 1995, $145,651 was excessive, and out of line with the compensation paid for similar positions by other Medicare-certified HHAs in Connecticut.

AHC periodically loaned money to ASMG to cover the latter corporation's "operating expenses". As of April 26, 1996, this debt amounted to $93,540. On that date, however, Gregory Bachand, acting on behalf of AHC, accepted an offer by ASMG "to sell 100% interest in itself to AHC in settlement of the debt".

During its final cost-reporting period (i.e., the period from January 1, 1996 to August 12, 1996), AHC paid a total of $440,200 in management fees to ASMG. The services provided by ASMG to AHC during this period consisted of management services furnished by Judith and Gregory Bachand and their three children (for which ASMG paid the five Bachands $178,333), and various other costs, such as automobile leasing and meeting and meals expenses (for which ASMG paid $64,894), for a total cost to ASMG of $243,227.

Of the $178,333 paid by ASMG to the five Bachands during 1996, $28,329 was excessive, and out of line with the compensation paid for similar positions by other Medicare-certified HHAs in Connecticut.

During 1996, ASMG incurred $26,218 in automobile leasing costs for vehicles that were used by the Bachands for non-business purposes, and $10,167 in unnecessary meeting and meals expenses.

### III. Pre-Sale Settlement/Audit Activities

On March 30, 1995, AHC filed its Medicare cost report for 1994. Based on a preliminary (i.e., unaudited) review of the cost report, the Intermediary determined that AHC had been overpaid for 1994 in the amount of $206,556. The Intermediary notified AHC of this determination by letter dated November 15, 1995.

The Intermediary began an on-site audit of the 1994 cost report on November 6, 1995. At the conclusion of the audit, on November 10, 1995, the Intermediary's auditor held an exit conference with the Judith and Gregory Bachand. During the conference, the auditor discussed the issues identified during the audit with the Bachands. On April 4, 1996, the Intermediary sent AHC a written report of the proposed audit adjustments. On April 8, 1996, AHC's accounting firm requested copies of the audit work papers supporting each of the proposed adjustments. The Intermediary complied with this request on April 10, 1996.

On June 27, 1996, AHC submitted its cost report for 1995. Based on a preliminary review of the cost report, the Intermediary determined that AHC had been overpaid for 1995 in the amount of $673,361. The Intermediary notified AHC of this determination by letter dated July 10, 1996.

### IV. The Sale of AHC to Homecare, Inc.

On July 25, 1996, AHC sold all of its assets and transferred its operations to Homecare, Inc. ("Homecare"), a separate Connecticut HHA. Under the terms of the sales agreement, Homecare assumed the month-to-month leases of AHC's offices, and purchased the equipment, goodwill, and other intangibles of AHC. AHC also agreed not to compete with Homecare for a five-year period, and to participate in a process designed to transfer AHC's patients to Homecare.

In return, Homecare agreed to pay AHC the sum of $300,000. Homecare also agreed to employ Judith Bachand for a six-month period at a salary of $70,000, Gregory Bachand for a three-month period at a salary of $25,000, and their three children for three-month periods at salaries of $13,333 each. Finally, Homecare agreed to pay Judith and Gregory $350,000 each in return for their agreements not to compete. These sums were to be paid in 120 monthly installments beginning on February 1, 1997.

Except for office and personal property leases, Homecare did not assume AHC's liabilities. AHC and Judith and Gregory generally agreed to indemnify Homecare for AHC's liabilities. However, although the agreement stipulated that Homecare was not responsible for the Medicare overpayments, Homecare was not entitled to indemnification for any Medicare recoupment action. The parties excluded Medicare claims from the indemnification requirement to prevent Homecare, in the event Medicare attempted to recover the overpayments from the provider, from "pay[ing] such claim [to Medicare] and offset[ting] such payment against future amounts due to [AHC] or to Judy or Greg" under the sales agreement.

V.   **Post-Sale Settlement/Audit Activities**

**(i) The 1994 Overpayment**

On August 5, 1996, eleven days after the sale of AHC's assets to Homecare, the Intermediary issued an NPR for 1994. Based upon an audit of the cost report, the Intermediary determined that AHC had been overpaid for 1994 in the amount of $419,194. The following costs claimed by AHC in its 1994 cost report were determined to be unallowable:

(a) the Intermediary disallowed a total of $190,640 in excessive compensation paid by AHC to Judith and Gregory Bachand and their three children;

7

(b) the Intermediary disallowed $314,263 in excessive pension costs paid by AHC;

(c) the Intermediary disallowed $7,159 in unnecessary dinner and meeting and meals expenses; and

(d) the Intermediary disallowed $8,632 in college and graduate school tuition expenses incurred by Judith and Chad Bachand.

In the NPR, the Intermediary advised AHC of its right to appeal the audit adjustments by filing a request for a hearing with the PRRB within 180 days of the date of the NPR. On February 4, 1997, 183 days after the date of the NPR, AHC requested a hearing on the adjustments. On February 20, 1998, the PRRB dismissed the appeal on the grounds that it had not been filed within 180 days of the date of the NPR, and that AHC had not demonstrated good cause for an untimely filing. AHC did not appeal the dismissal of its hearing request to the Secretary.

### (ii) The 1995 Overpayment

On July 24, 1997, the Intermediary issued an NPR for 1995. Based upon an audit of the cost report, the Intermediary determined that AHC had been overpaid for 1995 in the amount of $1,417,507. The following costs claimed by AHC in its 1995 cost report were determined to be unallowable:

(a) the Intermediary disallowed $716,140 in "management fees" paid by AHC to ASMG;

(b) the Intermediary disallowed $145,651 in excessive compensation paid by ASMG to Judith and Gregory Bachand and their three children;

(c) the Intermediary disallowed $688,275 in pension expense which AHC had accrued in 1995, but had failed to liquidate;

(d) the Intermediary disallowed $7,636 in excessive compensation paid to Yvonne Bachand;

(e) the Intermediary disallowed $9,109 in unnecessary meeting and meals and travel and entertainment expenses; and

(f) the Intermediary disallowed $13,647 in vehicle leasing costs incurred by AHC for vehicles that were used by the Bachands for non-business purposes.

In the NPR, the Intermediary advised AHC of its right to appeal the audit adjustments by filing a request for a hearing with the PRRB within 180 days of the date of the NPR. AHC did not request a hearing on any of the adjustments.

### (iii) The 1996 Overpayment

On September 11, 1997, AHC filed the cost report for its final cost-reporting period - i.e., the period from January 1, 1996 to August 12, 1996. In this cost report, AHC reported that it had been overpaid for that period in the amount of $573,244.

The Intermediary issued an NPR on September 24, 1998. Based upon a final settlement of the cost report, the Intermediary determined that AHC had been overpaid for 1996 in the amount of $1,004,850. The following costs claimed by AHC in its final cost report were determined to be unallowable:

(a) the Intermediary disallowed $440,200 in management fees paid by AHC to ASMG;

(b) the Intermediary disallowed $28,329 in excessive compensation paid by ASMG to Judith and Gregory Bachand and their three children;

(c) the Intermediary disallowed $32,189 in automobile leasing costs incurred by ASMG and AHC for vehicles that were used by the Bachands for non-business purposes;

9

(d) the Intermediary disallowed $11,248 in unnecessary meeting and meals expenses incurred by ASMG and AHC; and

(e) the Intermediary disallowed $7,292 in excessive compensation paid by AHC to Yvonne Bachand.

In the NPR, the Intermediary advised AHC of its right to appeal the audit adjustments by filing a request for a hearing with the PRRB within 180 days the date of the NPR. AHC did not request a hearing on any of the adjustments.

## **Proposed Conclusions of Law**

1. AHC failed to exhaust its administrative remedies with respect to the overpayment determinations made by the Intermediary by failing to file a timely appeal. 42 U.S.C. § 1395oo. Therefore, judgment should enter against AHC as a matter of law.

2. Federal law should be applied in determining whether the alter ego doctrine applies since this case involves the rights of the United States under a complex, nationwide program, i.e. the Medicare program. United States v. Kimbell Foods, Inc., 440 U.S. 715 (1979); Lansford-Coaldale Joint Water Authority v. Tonolli Corp., 4 F.3d 1209 (3d Cir. 1993); Friedman v. Heckler, 765 F.2d 383, 387 (2nd cir. 1985); United States v. Pisani, 646 F.2d 83 (3rd Cir. 1981).

3. The Government is permitted to pierce AHC's corporate veil. First National City Bank v. Banco Para El Comercio, 462 U.S. 611, 630 (1983); American Fuel Corp. v. Utah Energy Development Co., 122 F.3d 130, 134 (2nd Cir. 1997); Brosler v. Food Automation-Service, No 3:96-2345 (DJS), 1997 WL 711438 (D.Conn. Aug.

25, 1997); <u>Bridgestone v. Recovery Credit</u>, 98 F.3d 13 (2nd Cir. 1996); <u>Fletcher v. Alex, Inc.</u>, 68 F.3d 1451, 1458 (2nd Cir. 1995); <u>United States v. Golden Acres, Inc.</u>, 702 F.Supp. 1097, 1107-1108 (D. Del. 1988); <u>United States v. Healthwin-Midtown Convalescent Hospital and Rehabilitation Center</u>, 511 F.Supp. 416 (C.D. Cal. 1981), <u>aff'd</u> 685 F.2d 448 (9th Cir. 1982); <u>United States v. Pisani</u>, 646 F.2d 83 (3rd Cir. 1981); <u>United States v. Thomas</u>, 515 F.Supp. 1351, 1357 (W.D. Tex. 1981); <u>United States v. Normandy House Nursing Home, Inc.</u>, 428 F.Supp. 421, 424-425 (D.Mass. 1977).

4. Judith and Gregory Bachand are personally liable for AHC's overpayments. *Constructive Trust Theory*, <u>Pierce v. United States</u>, 255 U.S. 398, 402-403 (1921); <u>Libutti v. United States</u>, 107 F.3d 110, 125 (2nd Cir. 1997); <u>United States v. Idaho Falls Assoc. Ltd. Partnership</u>, 81 F.Supp.2d 1033, 1045-1046 (D. Idaho 1999); <u>Branch v. FDIC</u>, 825 F. Supp. 384, 411 (D.Mass. 1993); <u>United States v. Thomas</u>, 515 F.Supp. 1351 (W.D. Tex. 1981); <u>United States v. Bridle Path Enterprises, Inc.</u>, 2001 WL 1688911, *3 (D.Mass).

5. Judith and Gregory Bachand are also personally liable for AHC's overpayments pursuant to 31 U.S.C. § 3713(b). <u>King v. United States</u>, 379 U.S. 329, 337 (1964); <u>Crane v. Green & Freedman Baking Co., Inc.</u>, 134 F.3d 17, 23 (1st Cir. 1998); <u>United States v. Golden Acres, Inc.</u>, 684 F. Supp. 96, 102 (D. Del. 1988); <u>In re: Gottheiner</u>, 703 F.2d 1136 (9th Cir. 1983).

Respectfully submitted,

Kevin J. O'Connor
United States Attorney

Christine Sciarrino
Assistant United States Attorney
P.O. Box 1824
New Haven, Connecticut 06510
(203) 821-3780
Federal No. CT3393