FILED

2004 JUN 10 A 11: 12

U.S. DISTRICT COURT
HARTFORD, CT.

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : Civil No. 3:02CV00396 (AVC) |
| VS. | : |
| AMERICAN HOME CARE, INC., et al., | : |
| Defendant. | : JUNE 1, 2004 |

### STIPULATION OF UNCONTROVERTED FACTS AND LAW

The parties hereby stipulate to the following uncontroverted facts and law relevant to the trial of this case.

**I. FACTS**

(1) On September 1, 1992, defendant Judith Bachand incorporated American Home Care, Inc. ("AHC") under Connecticut law, for the purpose of operating a home health agency ("HHA"). AHC began to participate in the Medicare program as a provider of home health services on January 29, 1993. For Medicare cost-reporting purposes, AHC operated on a calendar year basis. Associated Hospital Service of Maine, Inc. ("the Intermediary") served as AHC's Medicare intermediary. AHC provided services to Medicare beneficiaries out of a main office and various branch offices in Fairfield County, Connecticut.

(2) At all times relevant to this case, Judith Bachand was the sole director and shareholder of AHC, as well as the corporation's President and Administrator. Defendant Gregory Bachand, Judith's husband, was the corporation's Chief Counsel and Chief Operating Officer. Their three children, Derek, Chad, and Tanya Bachand, served in various administrative and corporate capacities. Judith and Gregory's daughter-in-law, Yvonne Bachand, was also associated with AHC.

(3) Judith Bachand capitalized AHC with $1,000 in common stock, the minimum amount authorized. By the end of 1993, AHC's first year of operation, the corporation's liabilities exceeded its assets by $82,226. This deficit grew to $810,867 by the end of 1994, and to $1,505,756 by the end of 1995. On June 30, 1996, AHC's liabilities exceeded its assets by $1,296,288.

(4) During 1993 and 1994, AHC paid Judith and Gregory Bachand a total of $528,044 in salaries and other compensation. Of this amount, $141,267 was determined excessive by Medicare.

(5) During 1994, AHC paid Derek (aged 23), Chad (aged 22), and Tanya (aged 20) a total of $167,993 in compensation. For the first five months of 1994, Chad was a full-time student at Xavier University in Cincinnati, Ohio. For all of 1994, Tanya was a full-time student at Fairfield University. Of the $167,993 paid to Derek, Chad, and Tanya in 1994, $100,294 was determined excessive by Medicare.

(6) During 1995 and 1996, AHC paid Yvonne Bachand a total of $14,928, determined by Medicare as excessive compensation.

(7) AHC had two pension plans: a defined contribution or profit sharing plan (referred to as the "Retirement Plan"), and a defined benefit plan (referred to as the "Pension Plan"). Each plan had a five year vesting requirement. Under each plan, employer contributions were allocated to individual employee accounts on the basis of salaries.

(8) In 1994, AHC contributed a total of $409,083 to these two plans. Of this amount, $314,263 was determined by Medicare to be excessive, and out of line with the pension costs incurred by the 22 other Medicare-certified HHAs in Fairfield County.

(9) On December 29, 1995, AHC's Board of Directors decided that no employer contribution would be made to the Retirement Plan for 1995. AHC claimed Medicare reimbursement in its 1995 cost report for an accrued contribution to its Retirement Plan of $544,020. AHC also claimed Medicare reimbursement for an accrued contribution to its Pension Plan of $144,255. However, AHC never liquidated (i.e., paid) either accrual.

(10) AHC made the following payments for goods and services: $3,224 for travel and entertainment; $19,618 in automobile leasing costs; and $14,821 for

dinner and "meeting and meals" expenses. AHC also paid $8,632 in college and graduate school tuition expenses incurred by Judith Bachand.

(11) At some point in 1994, Judith and Gregory Bachand formed a separate corporation: American Senior Management Group, Inc. ("ASMG"). Judith, Derek, Chad, and Tanya Bachand each held a 25% ownership interest in ASMG. Judith and Gregory were directors of ASMG, and Gregory was the corporation's President and Secretary.

(12) Although AHC and ASMG were separately incorporated, the two corporations were physically and operationally indistinct. ASMG was comprised of current senior management of AHC - specifically, Judith and Gregory and their three children. The two corporations were located in the same building, and shared personnel and services, including accounting services.

(13) On December 30, 1994, the Board of Directors of AHC contracted with ASMG, effective January 1, 1995, to obtain the latter corporation's management expertise. In the written contract between the two corporations, ASMG agreed that its Management Team would perform all management duties for AHC. The contract did not establish a specific fee for these management services. The contract provided that AHC agreed to pay ASMG an annual fee, consisting of the sum total of all billings rendered by [ASMG] including expenses and miscellaneous charges as may be accounted for from time to time.

(14) On March 12, 1994, AHC's Board of Directors decided to purchase property in Stratford, Connecticut, to be used as a potential site for a branch office. However, due to zoning problems, AHC decided not to go ahead with the purchase and, on December 22, 1995, the Board decided to transfer the "deposit made relative thereto" to ASMG.

(15) During 1995, AHC paid a total of $716,140 in management fees to ASMG. The services provided by ASMG to AHC during 1995 consisted of management services rendered by Judith and Gregory Bachand and their three children (technically, the five Bachands were employed by ASMG, not by AHC, during 1995). ASMG paid the five Bachands a total of $375,417 in salaries for these management services.

(16) During 1995, the five Bachands utilized $10,064 in personal automobile expense paid by AHC. The compensation paid to the five Bachands in 1995 totaled $385,481 ($375,417 in salaries paid by ASMG and $10,064 in personal automobile expense paid by AHC).

(17) Of the $385,481 in compensation paid to the five Bachands in 1995, $145,651 was determined excessive by Medicare, and out of line with the compensation paid for similar positions by other Medicare-certified HHAs in Connecticut.

(18) AHC periodically loaned money to ASMG to cover the latter corporation's operating expenses. On April 26, 1996, Gregory Bachand, acting on behalf of AHC, accepted an offer by ASMG to sell 100% interest in itself to AHC in settlement of the debt.

(19) During its final cost-reporting period (i.e., the period from January 1, 1996 to August 12, 1996), AHC paid a total of $440,200 in management fees to ASMG. The services provided by ASMG to AHC during this period consisted of management services furnished by Judith and Gregory Bachand and their three children (for which ASMG paid the five Bachands $178,333 in compensation), and various other costs, such as automobile leasing and meeting and meals expenses (for which ASMG paid $64,894), for a total cost to ASMG of $243,227.

(20) Of the $178,333 in compensation paid by ASMG to the five Bachands in 1996, $28,329 was determined excessive by Medicare, and out of line with the compensation paid for similar positions by other Medicare-certified HHAs in Connecticut.

(21) During 1996, ASMG incurred $26,218 in automobile leasing costs for vehicles that were used by the Bachands for non-business purposes, and $10,167 in unnecessary meeting and meals expenses.

(22) On March 30, 1995, AHC filed its Medicare cost report for 1994. Based on a preliminary (i.e., unaudited) review of the cost report, the Intermediary

determined that AHC had been overpaid for 1994 in the amount of $206,556. The Intermediary notified AHC of this determination by letter dated November 15, 1995.

(23) The Intermediary began an on-site audit of the 1994 cost report on November 6, 1995. At the conclusion of the audit, on November 10, 1995, the Intermediary's auditor held an exit conference with Judith and Gregory Bachand. During the conference, the auditor explained the issues identified during the audit with the Bachands. On April 4, 1996, the Intermediary sent AHC a written report of the proposed audit adjustments. On April 8, 1996, AHC's accounting firm requested copies of the audit work papers supporting each of the proposed adjustments. The Intermediary complied with this request on April 10, 1996.

(24) On June 27, 1996, AHC submitted its cost report for 1995. Based on a preliminary review of the cost report, the Intermediary determined that AHC had been overpaid for 1995 in the amount of $673,361. The Intermediary notified AHC of this determination by letter dated July 10, 1996.

(25) On July 25, 1996, AHC, the Bachands and Homecare, Inc. ("Homecare") entered into an Agreement concerning AHC's operations.

(26) Except for office and personal property leases, Homecare did not assume AHC's liabilities. AHC and Judith and Gregory generally agreed to indemnify Homecare for AHC's liabilities. The agreement stipulated that Homecare was not responsible for the Medicare overpayments, and that Homecare was not

entitled to indemnification for any Medicare recoupment action. The parties excluded Medicare claims from the indemnification requirement to prevent Homecare, in the event Medicare sought to recover the overpayments from that provider, from paying such claim to Medicare and offsetting such payment against future amounts due to AHC or to the Bachands under the sales agreement.

(27) On August 5, 1996, eleven days after the execution of the Agreement, the Intermediary issued a Notice of Program Reimbursement ("NPR") for 1994. Based upon an audit of the cost report, the Intermediary determined that AHC had been overpaid for 1994 in the amount of $419,194. The following costs claimed by AHC in its 1994 cost report were determined to be unallowable:

(a) the Intermediary disallowed a total of $190,330 in excessive compensation paid by AHC to Judith and Gregory Bachand and their three children;

(b) the Intermediary disallowed $314,263 in excessive pension costs paid by AHC;

(c) the Intermediary disallowed $7,855 in unnecessary dinner and meeting and meals expenses; and

(d) the Intermediary disallowed $8,632 in college and graduate school tuition expenses incurred by Judith and Chad Bachand.

(28) In the NPR, the Intermediary advised AHC of its right to appeal the audit adjustments by filing a request for a hearing with the Provider Reimbursement

Review Board ("PRRB") within 180 days of the date of the NPR. On February 4, 1997, 183 days after the date of the NPR, AHC requested a hearing on the adjustments. On February 20, 1998, the PRRB dismissed the appeal on the grounds that it had not been filed within 180 days of the date of the NPR, and that AHC had not demonstrated good cause for an untimely filing. AHC did not appeal the dismissal of its hearing request to the Secretary.

(29)  On July 24, 1997, the Intermediary issued an NPR for 1995. Based upon an audit of the cost report, the Intermediary determined that AHC had been overpaid for 1995 in the amount of $1,417,507. The following costs claimed by AHC in its 1995 cost report were determined to be unallowable:

(a) the Intermediary disallowed $716,140 in "management fees" paid by AHC to ASMG;

(b) the Intermediary disallowed $145,651 in excessive compensation paid by ASMG to Judith and Gregory Bachand and their three children;

(c) the Intermediary disallowed $688,275 in pension expense which AHC had accrued in 1995, but had failed to liquidate;

(d) the Intermediary disallowed $7,636 in excessive compensation paid to Yvonne Bachand;

(e) the Intermediary disallowed $9,109 in unnecessary meeting and meals and travel and entertainment expenses; and

(f) the Intermediary disallowed $13,647 in vehicle leasing costs incurred by AHC for vehicles that were used by the Bachands for non-business purposes.

(30) In the NPR, the Intermediary advised AHC of its right to appeal the audit adjustments by filing a request for a hearing with the PRRB within 180 days of the date of the NPR. AHC did not request a hearing on any of the adjustments.

(31) On September 11, 1997, AHC filed the cost report for its final cost-reporting period - i.e., the period from January 1, 1996 to August 12, 1996. In this cost report, AHC reported that it had been overpaid for that period in the amount of $573,244.

(32) The Intermediary issued an NPR on September 24, 1998. Based upon a final settlement of the cost report, the Intermediary determined that AHC had been overpaid for 1996 in the amount of $1,004,850. The following costs claimed by AHC in its final cost report were determined to be unallowable:

(a) the Intermediary disallowed $440,200 in management fees paid by AHC to ASMG;

(b) the Intermediary disallowed $28,329 in excessive compensation paid by ASMG to Judith and Gregory Bachand and their three children);

(c) the Intermediary disallowed $32,189 in automobile leasing costs incurred by ASMG and AHC for vehicles that were used by the Bachands for non-business purposes;

(d) the Intermediary disallowed $11,248 in unnecessary meeting and meals expenses incurred by ASMG and AHC; and

(e) the Intermediary disallowed $7,292 in excessive compensation paid by AHC to Yvonne Bachand.

(33) In the NPR, the Intermediary advised AHC of its right to appeal the audit adjustments by filing a request for a hearing with the PRRB within 180 days from the date of the NPR. AHC did not request a hearing on any of the adjustments.

2.     LAW

A national program of health insurance for the aged and disabled, Medicare consists of two basic parts. Part A of Medicare, 42 U.S.C. § 1395c et seq., provides for the payment of inpatient hospital and related post-hospital benefits on behalf of eligible individuals. Part B of Medicare, 42 U.S.C. § 1395j et seq., establishes a voluntary supplemental insurance program intended for the payment of physicians' and other health services. The present case involves Part A of Medicare.

The Secretary of Health and Human Services ("the Secretary") is responsible for determining the amount of Part A payment due a "provider of service" (e.g., a hospital or home health agency ("HHA")) for services furnished to program beneficiaries. 42 U.S.C. § 1395g. However, the Secretary may contract with private insurance companies, referred to as intermediaries, to assist in the administration of the program. 42 U.S.C. § 1395h.

During the periods at issue in this case, the Medicare program reimbursed HHAs on a "reasonable cost" basis. 42 U.S.C. § 1395f(b). The statute defines reasonable cost as the "cost actually incurred, excluding therefrom any part of incurred cost found unnecessary in the efficient delivery of needed health services". 42 U.S.C. § 1395x(v)(1)(A). Reasonable cost includes "all necessary and proper expenses incurred in furnishing services", but excludes "amounts not related to patient care". 42 C.F.R. § 413.9(c)(3). Moreover, where services are furnished to a provider by an "organization related to the provider by common ownership or control", the cost of such services is "included in the allowable cost of the provider at the cost to the related organization", except that "such cost must not exceed the price of comparable services ... that could be purchased elsewhere". 42 C.F.R. § 413.17(a).

Medicare providers are required to maintain auditable cost data in support of their reimbursement claims. 42 C.F.R. §§ 413.20(a) and 413.24(a),(c). See also 42 U.S.C. § 1395g(a). A provider bears the burden of establishing its entitlement to Medicare payment. See University of Iowa Hospitals and Clinics v. Shalala, 180 F.3d 943, 955 (8th Cir. 1999)("Medicare regulations place upon the Hospital the obligation to substantiate the costs that it claims"); St. Paul-Ramsey Medical Center v. Bowen, 816 F.2d 417, 419 (8th Cir. 1987).

Medicare providers are required to base their costs on the accrual basis of accounting. Under this accounting basis, revenue is reported in the period in which it is earned, regardless of when it is collected, and expenses are reported in the period in which they are incurred, regardless of when they are paid. 42 C.F.R. § 413.24(a),(b)(2). However, to ensure that only actual costs are reimbursed by Medicare, the Secretary has established time limits for the liquidation of various categories of accruals. For example, short-term liabilities generally must be liquidated within one year after the end of the cost year in which they were incurred. 42 C.F.R. § 413.100(c)(2)(i)(A).

During each cost year, an intermediary will make interim payments to the provider, based on estimates of the provider's reimbursable costs. 42 C.F.R. § 413.60(c). At the close of each cost year, a provider is required to file a Medicare cost report with its intermediary. 42 C.F.R. § 413.24(f). The report identifies the provider's costs and the percentage of those costs that have been allocated to services furnished Medicare beneficiaries. 42 C.F.R. §§ 413.20 and 413.24. The intermediary analyzes or audits the cost report, and issues a notice of program reimbursement ("NPR") for the period covered by the report. In the NPR, the intermediary compares the interim payments made to the provider during the year with the reimbursement that was actually due, and pays or credits the provider for

any underpayment or collects any overpayment. 42 C.F.R. §§ 405.1803(c) and 413.960(c).

If the provider is dissatisfied with the intermediary's determination as to the amount due for the cost year, it may request a hearing before the Provider Reimbursement Review Board ("PRRB"). However, to qualify for a hearing, the amount in controversy must be at least $10,000, and the provider must file its request within 180 days of the NPR. The PRRB's decision is final, unless the Secretary, within 60 days, reverses, affirms, or modifies the decision. Providers may

obtain judicial review of any "final decision" of the Secretary or the PRRB. 42 U.S.C. § 1395oo(a),(f).

          Respectfully submitted,

          THE PLAINTIFF
          Kevin J. O'Connor
          United States Attorney

          By: _____
          Christine Sciarrino
          Assistant United States Attorney
          P.O. Box 1824
          New Haven, Connecticut   06510
          (203) 821-3780
          Federal No. CT3393

          THE DEFENDANT

          By: _____
          Christopher G. Winans, Esq.
          100 Mill Plain Road, 4th Floor
          P.O. Box 2809
          Danbury, Connecticut   06813-2809
          (203) 748-4888
          Federal Bar No. CT02254